IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DILORENZO BIOMEDICAL, LLC,<br><br>         Plaintiffs,<br><br>     v.<br><br>LIVANOVA, INC. and LIVANOVA USA, INC.,<br><br>         Defendants. | Civil Action No. 4:23-cv-1800<br><br>Patent Case<br>Jury Trial Demanded |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(7)**

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. ARGUMENT ........................................................................................................ 2

    A.     The Court Should Dismiss DiLorenzo's Complaint for Lack of Standing Because DiLorenzo Is Not an Exclusive Licensee with the Right to Sue Absent LivaNova's Consent ......................................................................... 2

    B.     The Court Should Dismiss DiLorenzo's Complaint for Lack of Standing Because DiLorenzo Has No Ownership Rights Outside His "Field of Use," Which Does Not Include Epilepsy Treatment ......................................... 4

        1.     DiLorenzo's Newly Produced "Evidence" Does Not Negate Nearly Twenty Years of Conduct Demonstrating DiLorenzo's Intent to Only Retain a License for the Treatment of Obesity and Metabolic Disorders ................................................................................................. 4

        2.     The Plain Language of the Agreement Confirms DiLorenzo's Intent; DiLorenzo's Ignores It ............................................................... 8

        3.     The Court Should Ignore DiLorenzo's Self-Serving Declaration and Questionable Exhibits ..................................................................... 9

    C.     The '880 Patent Is Owned by LivaNova, Despite That DiLorenzo Failed to Execute an Assignment to LivaNova ......................................................... 12

III. CONCLUSION .................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A123 Sys., Inc. v. Hydro-Quebec*,
  626 F.3d 1213 (Fed. Cir. 2010)..................................................................................................2

*Alnylam Pharms., Inc. v. Tekmira Pharms. Corp.*,
  No. 12-10087-RWZ, 2012 WL 4857580 (D. Mass. Sept. 24, 2012)....................................3, 4

*Central Flyway Air, Inc. v. Grey Ghost Int'l, LLC*,
  No. 3:20-CV-05506-BJR, 2022 WL 4534402 (W.D. Wa. Sept. 28, 2022).............................10

*Diamondback Indus., Inc. v. Repeat Precision, LLC*,
  No. 6:19-CV-00034-ADA, 2019 WL 8501017 (W.D. Tex. Sept. 11, 2019) ...........................3

*F.T.C. v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997), *as amended* (Apr. 11, 1997)..................................................10

*Hubacek v. Ennis State Bank*,
  317 S.W.2d 30 (Tex. 1958)........................................................................................................5

*King v. Rice*,
  191 P.3d 946 (Wash. Ct. App. 2008) ....................................................................................5, 6

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
  925 F.3d 1225 (Fed. Cir. 2019)..............................................................................................2, 3

*Matter of Marriage of Cardwell*,
  479 P.3d 1188 (Ct. App. Wa. 2021) .........................................................................................9

*Textile Productions, Inc. v. Mead Corp.*,
  134 F. 3d 1481 (Fed. Cir. 1998)................................................................................................3

**Other Authorities**

37 C.F.R. § 3.54 ...............................................................................................................................12

Fed. R. Civ. P. 19..............................................................................................................................3

## **TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| O | May 26, 2023 Correspondence from Carlson Caspers to Liston Abramson |
| P | September 14, 2023 Correspondence from Fish & Richardson to Liston Abramson |
| Q | November 6-November 8, 2023 Correspondence between Fish & Richardson and Liston Abramson |

**I.     INTRODUCTION**

DiLorenzo's response to LivaNova's Motion to Dismiss fails to address key issues with its Complaint.  ***First***, DiLorenzo admits it was required to seek LivaNova's consent to initiate a patent infringement suit.  Resp. at 18-19.  This confirms DiLorenzo understood what the license granted: a license to DiLorenzo ***only*** to "make, use, sell, offer for sale, import, export and sublicense."  Ex. E, § 4.  DiLorenzo ***did not*** retain the right to sue absent consent from LivaNova and thus lacks standing to bring this lawsuit.  *Id.*, § 20.  DiLorenzo attempts to argue an exception to the standing requirement for cases where the accused infringer is the patentee, but that exception only applies when the patentee is an exclusive licensee, which DiLorenzo is not.

***Second***, any rights DiLorenzo has in the Asserted Patents are limited to DiLorenzo's Field of Use of treating obesity and metabolic disorders.  DiLorenzo's strained reading of the License Grant ignores both the plain language of the agreement and the wealth of contextual evidence surrounding the agreement, both of which make clear the License Grant was never intended to cover LivaNova's business relating to epilepsy treatment.

Moreover, for nearly twenty years, Dr. DiLorenzo behaved in a manner consistent with LivaNova's interpretation.  In fact, ███████████████████████████████████████ ███████████████████████████████████████████████████.  When LivaNova ███████████████████████████████████████████████████ ███████████████████████████████████████████.  And never, in the years of correspondence, did Dr. DiLorenzo suggest that he retained rights to the Asserted Patents in the field of epilepsy treatment or that LivaNova's products may be infringing.  Only now that DiLorenzo has initiated litigation does DiLorenzo claim rights in the field of epilepsy treatment.

As outlined below and in LivaNova's Motion, DiLorenzo's Complaint should be dismissed with prejudice for lack of standing as to all Asserted Patents.

**II.     ARGUMENT**

    **A.     The Court Should Dismiss DiLorenzo's Complaint for Lack of Standing Because DiLorenzo Is Not an Exclusive Licensee with the Right to Sue Absent LivaNova's Consent**

DiLorenzo repeatedly and incorrectly refers to itself as an "exclusive licensee." DiLorenzo is not an exclusive licensee and did not retain the right to sue in his Field of Use. "In determining ownership for purposes of standing, labels given by the parties do not control. Rather, the court must determine whether the party alleging effective ownership has in fact received all substantial rights from the patent owner." *A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1218 (Fed. Cir. 2010). The Federal Circuit's analysis in *Lone Star Silicon* is governing here. *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225 (Fed. Cir. 2019). In *Lone Star Silicon*, the Federal Circuit considered whether a transfer agreement reflected a transfer of all substantial rights such that the plaintiff, Lone Star, had the right to sue. *Id.* at 1231. The Federal Circuit explained that in analyzing this question, the Federal Circuit has "often focused on two salient rights: enforcement and alienation." *Id.* (citing *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001)). The Federal Circuit explained: "a transferee that receives all substantial patent rights from a transferor would *never* need consent from the transferor to file suit." *Id.* (citing same; emphasis original). The Federal Circuit went on to hold the plaintiff did not hold all the substantial rights in the asserted patents and could not assert the patents in its own name because (1) the plaintiff did not have the right to sue any entity without the consent of the original patent owner and (2) because the plaintiff could not sell the patents without an agreement to be bound by the same restrictions as Lone Star. *Id.* at 1333-38.

The same scenario is present here. The fact that the Agreement includes "exclusive license" in its lengthy title is irrelevant because the License Grant does not convey all substantial rights in the Asserted Patents. *First*, the License Grant does not include the right of "enforcement"

2

without LivaNova's consent.  The License Grant only includes the rights to "make, use, sell, offer for sale, import, export and sublicense devices and methods."  Ex. E, § 4.  The right of "enforcement" (the right to sue) is contained in Section 10 of the Agreement, which both parties agree includes a requirement that LivaNova consent to any patent infringement action.  *Id.*, § 10; Resp. at 11-12; 18-19.  **Second**, the License Grant contains restrictions on "alienation" because any sublicensing by DiLorenzo "shall be subject and subordinate to terms and conditions of [the] Agreement."  Ex. E, § 11.  In other words, similar to the plaintiff in *Lone Star Silicon*, DiLorenzo can only transfer its limited rights in the Asserted Patents to another.  *Lone Star Silicon*, 925 F.3d at 1232-33.  These facts are not disputed and establish that DiLorenzo does not hold all substantial rights in the Asserted Patents and is, therefore, not an exclusive licensee with the right to sue.[1]

The exception to *Waterman*, where an exclusive licensee has prudential standing to bring suit against the patentee (Resp. at 10-12), is inapplicable because it only applies to a party who ***is an exclusive licensee***.  In *Textile Productions*, the Federal Circuit explained that "only an exclusive licensee has standing to sue for infringement, even under the exception outlined above." *Textile Productions, Inc. v. Mead Corp.*, 134 F. 3d 1481, 1484 (Fed. Cir. 1998).  The Federal Circuit held that because the agreement between the parties did not convey an exclusive license to the plaintiff, they "had no standing to assert patent infringement." *Id*. at 1485.  In *Diamondback Industries*, the court found the license granted to the plaintiff was an exclusive license, including the right to enforce.  *Diamondback Indus., Inc. v. Repeat Precision, LLC*, No. 6:19-CV-00034-ADA, 2019 WL 8501017, at *4 (W.D. Tex. Sept. 11, 2019).  And in *Alnylam Pharms. Corp.*, the

---

[1] The key difference between *Lone Star Silicon* and this case is that Lone Star sought leave to join AMD as a necessary party under Fed. R. Civ. P. 19 before the case was dismissed and the Federal Circuit agreed that was appropriate.  *Lone Star Silicon*, 925 F.3d at 1236-37.  Joinder of LivaNova is not feasible under Rule 19(a).

parties **agreed** that the plaintiff was an exclusive licensee. *Alnylam Pharms., Inc. v. Tekmira Pharms. Corp.*, No. 12-10087-RWZ, 2012 WL 4857580, at *2 (D. Mass. Sept. 24, 2012). As explained, Federal Circuit case law counsels that DiLorenzo is **not** an exclusive licensee with all substantial rights in the Asserted Patents and the exception to *Waterman* does not apply.

DiLorenzo also erroneously argues that because Section 10 of the agreement references infringement by a "third party," it is irrelevant. To the contrary, this confirms LivaNova's position that DiLorenzo is not an exclusive licensee and has **no rights to sue LivaNova at all**. If the License Grant does not include a right to sue in the Field of Use, and Section 10 only covers the right to sue third parties (with LivaNova's consent), that means the licensor retained those rights to sue and DiLorenzo retained none. Simply put, DiLorenzo did not receive all rights in the Asserted Patents and is therefore not an exclusive licensee.

> **B.    The Court Should Dismiss DiLorenzo's Complaint for Lack of Standing Because DiLorenzo Has No Ownership Rights Outside His "Field of Use," Which Does Not Include Epilepsy Treatment**
>
> **1.    DiLorenzo's Newly Produced "Evidence" Does Not Negate Nearly Twenty Years of Conduct Demonstrating DiLorenzo's Intent to Only Retain a License for the Treatment of Obesity and Metabolic Disorders**

DiLorenzo does not address, head-on, the wealth of evidence corroborating LivaNova's interpretation of the License Grant and the many instances in which Dr. DiLorenzo himself confirmed the parties' intent. Rather, DiLorenzo gives a series of excuses for why the Court should ignore it. None are availing.

> **a)    The Objective and Circumstances Surrounding the Making of the Contract Support LivaNova's Position**

The Agreement's objective, as made clear from the Agreement and the documents discussed therein, was to grant back to DiLorenzo a license in the field of use of treating obesity and metabolism. Ex. E, pg. 2 ("Licensor would grant back to DiLorenzo certain of the assigned

4

intellectual property relating to obesity and metabolism"). DiLorenzo contends this was merely laying out what was said in an earlier agreement that does not "control the scope of the final agreement…where ordinary rules of construction render the final terms unambiguous." Resp. at 15. First, whether that phrase was used in an earlier agreement is irrelevant. The fact is that the phrase was also used in ***this Agreement*** to explain the parties' objective in entering into the Agreement. If DiLorenzo wanted to clarify that the License Grant was intended to cover sympathetic nervous system modulation therapy outside the field of treating obesity and metabolic disorders, DiLorenzo could have clarified as much in this recitation of the objective of the agreement (or elsewhere in the agreement, for that matter).

Second, it is not clear to which "ordinary rule of construction" DiLorenzo is referring. *Id*. If DiLorenzo is referring to the prohibition on considering extrinsic evidence under Texas's parol evidence rule (*see, e.g., Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958)), that is not applicable here, and clearly DiLorenzo agrees as evidenced by Dr. DiLorenzo's declaration and exhibits. Under Washington law, "[e]xtrinsic evidence may be considered regardless of whether the contract terms are ambiguous." *King v. Rice*, 191 P.3d 946, 951 (Wash. Ct. App. 2008). It is for this reason that it is appropriate for the Court to consider Exhibits A through D of LivaNova's motion, which further supports that LivaNova's predecessor-in-interest would ***never*** have given back to DiLorenzo field of use rights relating to its own business. *See generally*, Mot. at IV.B.1 (reciting the many instances in which the parties agreed that DiLorenzo was assigning to BioNeuronics all interests in DiLorenzo's intellectual property relating to the business of the company, which was epilepsy treatment). In fact, Exhibit 4 to Dr. DiLorenzo's declaration reiterates that "any patent claim based (wholly or in part) on inventions you assigned to BioNeuronics Corporation belongs to BioNeuronics Corporation." Dkt. 33-9, pg. 1. The scope of

5

the assignment includes any inventions that "pertain to any actual or projected line of business activity of the Company." *Id*.

Additionally, DiLorenzo's discussion of the integration clauses under Washington case law is incorrect. As the court explained in *King*, "extrinsic evidence may be considered regardless of whether the contract terms are ambiguous," and "[t]his is the case ***even when there is an integration clause***, as long as the court uses the extrinsic evidence to explain undefined contract terms, not to modify, vary, or contradict terms of the written contract." *Id*. (emphasis added). Thus, the fact that the Agreement contains an integration clause is irrelevant.

The definition of "Second Field of Use" in the Agreement serves as another example of this clear division. When licensing back certain of DiLorenzo's non-assigned patents to LivaNova's predecessor-in-interest, Dr. DiLorenzo stated that he was "retaining ownership of items listed in section 1 of that Appendix but will exclusive license such items (hereafter termed Licensed Autonomic Patents) to the company ***for use in epilepsy applications*** (hereafter termed Second Field of Use)." Ex. E, § 3 (citing Ex. B). The parties did not identify the license back to LivaNova as "epilepsy applications using parasympathetic neuromodulation." The parties simply said, "epilepsy applications." In sum, the Agreement itself, other related agreements, and correspondence between the parties support the parties' intent to only grant back to DiLorenzo rights in the field of treating obesity and metabolic disorders and for LivaNova's predecessor-in-interest to maintain its rights in the field of epilepsy treatment.

      b)  **The Subsequent Conduct and Course of Dealing Between the Parties Support LivaNova's Position**

DiLorenzo's attempts to explain away the parties' subsequent correspondence and course of dealing do not contradict and, in fact, support LivaNova's position. First, with respect to Dr. DiLorenzo's March 13, 2013 email, DiLorenzo does not address the fact that Dr. DiLorenzo ***agrees***

6

LivaNova's ownership interest is in treating "epilepsy and other areas." Ex. J at 2. Even if Dr. DiLorenzo was referencing Dr. DiLorenzo's ownership in the field of "Autonomic Modulation and Neuromodulation for Obesity & Metabolism," it does not diminish the fact that Dr. DiLorenzo confirmed the parties' intent to divide the intellectual property between "metabolism and autonomic structures" and "epilepsy and other areas." *Id*.

Second, with respect to Dr. DiLorenzo's correspondence with Cyberonics regarding ▮▮▮▮▮, DiLorenzo only argues that DiLorenzo's rights "extend to sympathetic nervous system modulation therapy, whether used to treat epilepsy other otherwise." Resp. at 18. Presumably, in DiLorenzo's view, it follows that ▮▮▮▮▮. But there is no evidence of that, and Dr. DiLorenzo's ▮▮▮▮▮ shows Dr. DiLorenzo understood he did not have rights to pursue litigation in the field of epilepsy treatment. In fact, Cyberonics clarified as much in its response. When Dr. DiLorenzo first inquired about licensing ▮▮▮, Cyberonics asked, "Are you referring to sub-licenses that pertain to the obesity/metabolic disorder indication?" Ex. K. at 9. Dr. DiLorenzo said, "[t]hose as well as autonomic modulation." *Id*. Cyberonics responded by clarifying that "you are free to grant sublicenses within your exclusive fields of use without our consent. Thus, I assume that you are proposing a sub-license that requires our consent." *Id*. at 8. DiLorenzo argues this supports DiLorenzo's view that the License Grant included "autonomic modulation," but it does not. Dr. DiLorenzo continued to seek Cyberonics' consent ▮▮▮▮▮. *See generally*, Exs. L-N. If it was clear to Dr. DiLorenzo that he had the right to license and assert the patents in the field of sympathetic nervous system

7

modulation therapy, and that understanding was confirmed by Cyberonics, he would not have pursued those rights from LivaNova for over a decade. Moreover, he would not have been willing to pay ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See generally* Exs. M, N. This is nonsensical and is further evidence that DiLorenzo's interpretation of the License Grant should be rejected.

### 2. The Plain Language of the Agreement Confirms DiLorenzo's Intent; DiLorenzo's Ignores It

The plain grammatical reading of the License Grant reflects the parties' intent only to grant back to DiLorenzo a license in the field of treating obesity and metabolic disorders.

As DiLorenzo states, the word "for" can be used "as a function word to indicate purpose." Resp. at 12; Ex. 3 to Abramson Decl. But it can also be used to mean "being or constituting." Ex. 3 to Abramson Decl. The full clause states:

> devices and methods *for* sympathetic nervous system modulation therapy and *for* neuromodulation therapy *for* treating obesity and other metabolic disorders

The phrase "*for* treating obesity and other metabolic disorders" describes the purpose for which those treatments are used, whereas "*for* sympathetic nervous system modulation therapy" and "*for* neuromodulation therapy" are both types of therapies and describe the types of therapy the license constitutes. In other words, it is more logical for the purpose of the license grant to modify both types of therapies that make up the License Grant rather than only to provide the purpose for one type of therapy. Moreover, to read "*for* sympathetic nervous system modulation" therapy without applying the "obesity and other metabolic disorders" modifier would mean LivaNova's predecessor-in-interest granted to DiLorenzo "sympathetic nervous system modulation therapy" ***for any purpose***, which contradicts the agreement and every other agreement between the parties which kept all epilepsy-related rights with LivaNova, as discussed above.

8

DiLorenzo relies on Washington's "last antecedent rule" in support of its position. Resp. at 12-13. Putting aside that this rule relates to statutory, and not contract, interpretation, more recent case law explains that "[t]he rule of the last antecedent can be overcome by other indicia of meaning." *Matter of Marriage of Cardwell*, 479 P.3d 1188, 1192 (Ct. App. Wa. 2021) (internal quotations and citations omitted). The Supreme Court of Washington has chosen to ignore the rule when following it would lead to an "interpretation contrary to the reading of the whole statute and the policies behind the statute." *Id*. As the court pointed out, "[s]ince the English speaking universe employs commas arbitrarily and whimsically, a court should not divine legislative intent on the thin reed of the placement of a comma," or in this case, the lack of a comma.

*Cardwell* provides a helpful parallel to this case. In *Cardwell,* the court was interpreting a statute that contained the clause "[i]s based on a change of residence of the parent with whom the child does not reside the majority of the time or an involuntary change in work schedule by a parent which makes the residential schedule in the parenting plan impractical to follow." *Id*. at 1191. The court was required to determine whether the clause "which makes the residential schedule in the parenting plan impractical to follow" was intended to modify just "an involuntary change in work schedule by a parent" or also "a change of residence of the parent with home the child does not reside the majority of the time." *Id*. Considering the practical effect of adopting the interpretation and the legislative intent, the court determined that the last clause modified both of the first clauses despite the last antecedent rule and the lack of a comma. *Id*. at 1192-93. For the reasons discussed above, the same outcome is warranted here.

### 3. The Court Should Ignore DiLorenzo's Self-Serving Declaration and Questionable Exhibits

The Court should ignore the litigation-driven explanation of changes to an alleged previous version of the Agreement in Dr. DiLorenzo's declaration and exhibits 1 and 2 thereto. With respect

9

to the declaration, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993)). Dr. DiLorenzo points to no corroborating evidence relating to these documents, such as a description of how these versions came into existence or with whom they were exchanged. *Central Flyway Air, Inc. v. Grey Ghost Int'l, LLC*, No. 3:20-CV-05506-BJR, 2022 WL 4534402, at *7 (W.D. Wa. Sept. 28, 2022) (granting summary judgment of breach of contract claim where the plaintiff's only evidence was a self-serving declaration with no corroborating evidence "that the alleged agreement existed, or indicating any circumstances under which it came into being."). Notably, DiLorenzo has never produced these documents or raised this alleged explanation in the twenty years of correspondence between the parties or even in the past six months when litigation counsel specifically asked whether DiLorenzo had any documents supporting his position.[2] *See* Ex. O, pg. 2; Ex. P, pg. 1. Dr. DiLorenzo's eleventh-hour declaration should be given no weight in the Court's analysis.

With respect to exhibits 1 and 2 to Dr. DiLorenzo's declaration, Dr. DiLorenzo states that Exhibit 1 is a "true and correct copy of a draft of a license agreement, dated January 25, 2005." Dkt. 33-5, ¶ 3. Dr. DiLorenzo then states that Exhibit 2 is a "true and correct copy of a draft of the license agreement from on or around March 2005. This draft shows that I made edits to the definition of the Field of Use ***in tracked changes***." *Id*., ¶ 4 (emphasis added). However, when reviewing Exhibit 1 and Exhibit 2, it is clear that Exhibit 2 is ***not*** a redline to Exhibit 1. For example, in Exhibit 1, the title of the first numbered paragraph is "Intellectual Property Transfer."

---

[2] Even if Dr. DiLorenzo were to provide further "corroborating evidence" at this late stage, it could not change the outcome, given the wealth of evidence discussed above in Sections II.B.1 and II.B.2.

10

But in Exhibit 2, it is titled "License Grant," and that change is *not shown in redline*, nor is the first numbered paragraph of Exhibit 1.[3]

Whether Exhibit 2 is actually a redline to Exhibit 1 is illustrative of a larger point, which is that these drafts lack context and have no evidentiary value. Dr. DiLorezno did not produce all iterations of the Agreement, nor did he produce any correspondence associated with the Agreement or his changes thereto. It is just as likely Dr. DiLorenzo made these clarifications to ensure that "for treating obesity and metabolic disorders" properly modified both clauses, as that is consistent with the plain language of the agreement and the nearly twenty-year history between the parties. DiLorenzo has produced no evidence corroborating Dr. DiLorenzo's explanation of the change in the language of the agreement. What is probative is the actual language in the Agreement and the course of dealing between the parties, both of which support LivaNova's interpretation of the License Grant.

***

What is abundantly clear from all the agreements and correspondence (and not disputed by DiLorenzo) is that the parties' *never* expressed an intent to divide the fields of use along the lines of "sympathetic" and "parasympathetic" nervous system modulation therapy for treating epilepsy. Only now, nearly twenty years later and in the context of litigation, has DiLorenzo raised this interpretation of the License Grant. DiLorenzo's interpretation, which is contradicted by the language of the License Grant, the prior agreements between the parties, and the course of dealing between Dr. DiLorenzo and LivaNova, is only supported by Dr. DiLorenzo's self-serving and unsupported affidavit. It should not be adopted.

---

[3] LivaNova requested the native versions of these documents. DiLorenzo declined to produce them. *See generally* Ex. Q.

11

### C. The '880 Patent Is Owned by LivaNova, Despite That DiLorenzo Failed to Execute an Assignment to LivaNova

LivaNova owns the '880 patent, even if Dr. DiLorenzo did not execute a formal assignment of the '880 patent to LivaNova, as required. Recording an assignment in the patent office "is not a determination by the Office of the validity of the document or the effect that document has on the title to an application, a patent, or a registration." 37 C.F.R. § 3.54. DiLorenzo does not dispute that every agreement between the parties requires Dr. DiLorenzo to disclose and execute an assignment to BioNeuronics for any invention relating to BioNeuronics' business. Ex. A § 2(b); Ex. B §§ 2(b), 2(c); Ex. D, § 4(b); Ex. E, pg. 1; Ex. F, §§ 7.3, 8.2. These assignments were codified in the "Assignment to Neurobionics Corporation" in which Dr. DiLorenzo assigned "all inventions, original works of authorship, developments, improvements, trade secrets, patents, patent applications, and other intellectual property, including clinical and preclinical data, related to the Company's business of neurodiagnostics and/or neuromodulation." Ex. C. As DiLorenzo's response explains, "neuromodulation" is the broadest category in this field, and generally means "delivery of a stimulus to the nervous system." Resp. at 4. As DiLorenzo argues, the claims of the '880 patent relate to "sympathetic nervous system modulation therapy," which is a subset of neuromodulation. Resp. at 20, 4. Thus, the '880 patent falls under this assignment. The exception contained in § 6 of the Agreement does not apply. Section § 6 of the Agreement only grants DiLorenzo the right to prosecute continuing patent applications in the Field of Use, which, as explained above, does not include epilepsy treatment. Because, according to DiLorenzo, the '880 patent relates to a system and method for epilepsy treatment (Dkt. 1, ¶¶ 1, 2, 43-52), it was assigned to LivaNova's predecessor-in-interest. Thus, LivaNova is the owner of the '880 patent.

DiLorenzo argues it disclosed the '880 patent to LivaNova's predecessor-in-interest and cites a letter in response to that disclosure in support. However, DiLorenzo does not cite any

12

evidence that the application that led to the '880 patent was actually included in Dr. DiLorenzo's alleged correspondence. Further, the parties' course of dealings over the past twenty years establishes that Dr. DiLorenzo was not trying to read any of the patents against LivaNova's products, so to say DiLorenzo's Complaint was a shock to LivaNova is an understatement. Moreover, as the letter points out, "[i]t is always difficult, of course, to know whether a pending patent claim will actually be granted in that form when the patent issues. Claims can be amended or canceled during prosecution based on many factors, including unpatentability over prior art." However, the letter is clear that "[a]ny patent application containing claims falling under any one of the three clauses of the definition of Company Inventions and Works are the property of BioNeuronics Corporation and should be assigned back to the company." Dkt. 33-9, pg. 2. Simply because Dr. DiLorenzo failed to execute a formal assignment in the patent office (as the parties' agreements required him to do) after the patent issued does not mean that LivaNova is not the rightful owner of the '880 patent.

## III.   CONCLUSION

DiLorenzo lacks standing to bring this suit against LivaNova because DiLorenzo failed to join LivaNova as a plaintiff and because DiLorenzo does not have rights to the Asserted Patents in the field of epilepsy treatment. DiLorenzo's Complaint should be dismissed with prejudice.

Dated: November 16, 2023

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ Benjamin C. Elacqua*
Benjamin C. Elacqua
*Attorney-in-Charge*
Texas Bar No. 24055443
elacqua@fr.com
Karrie Wheatley
Texas Bar No. 24098605
wheatley@fr.com
Kathryn Quisenberry
Texas Bar No. 24105639
quisenberry@fr.com
909 Fannin Street, Suite 2100
Houston, TX 77010
Tel: (713) 654-5300

**COUNSEL FOR DEFENDANTS,
LIVANOVA, INC. AND LIVANOVA USA**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 16, 2023, a true and correct copy of the foregoing document was served via electronic mail on all counsel of record.

*/s/ Benjamin C. Elacqua*
Benjamin C. Elacqua